**NELLO L. TEER COMPANY, Plaintiff,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Defendant.**

**Civ. A. No. 87–2997–OG.**

United States District Court, District of Columbia.

July 18, 1988.

**584**

Julian F. Hoffar, John B. Tieder, Robert K. Cox, Richard G. Mann, Jr., Vienna, Va., for plaintiff.

Sara E. Lister, Robert C. Polk, Thomas B. Dorrier, Washington, D.C., for defendant.

## MEMORANDUM

GASCH, Senior District Judge.

### INTRODUCTION

This is an appeal by the Nello L. Teer Co. ("Teer"), a construction contractor, from the final decision of the General Manager of the Washington Metropolitan Area Transit Authority ("WMATA") concerning the equitable adjustment of a contract. WMATA substantially adopted an advisory opinion of the Corps of Engineers Board of Contract Appeals ("Board of Contract Appeals" or "Board"), except to the extent that it addresses and offers conclusions concerning the allowance of "additional profits."

The underlying dispute arises out of a contract awarded to plaintiff by WMATA for the construction of "Section K–2, Clarendon Station, Vienna Route, of the Washington Metrorail System in Arlington, Virginia." Plaintiff has sought an equitable adjustment of $12,336,342 for costs arising from WMATA's delay in providing necessary easements for underpinning buildings immediately adjacent to the subway station and line that was built by plaintiff pursuant to the contract. There is no dispute that WMATA failed to timely provide to Teer the easements it was obligated to provide under the terms of the contract. The dispute in this case centers on the *effect* of the delay on Teer's operations and costs, or in other words, the amount due to Teer as an equitable adjustment.

On November 16, 1979, WMATA's Contracting Officer unilaterally granted an equitable adjustment of $592,814 to Teer for the effects of the delay in furnishing the easements. Five years after an exhaustive thirteen-day evidentiary hearing held in April of 1981, the Board of Contract Appeals issued an advisory opinion on September 30, 1986, determining that Teer was entitled to an additional $195,807, for a total equitable adjustment of $788,621,

which included $58,870 for additional profit. On December 30, 1986, the Board denied WMATA's motion for reconsideration, which focused on the award of additional profit. On August 24, 1987, WMATA adopted the Board's adjustment of the equitable award, except for the additional profit, from which WMATA claims immunity. WMATA thereby allowed an additional equitable adjustment of $136,937.

## BACKGROUND FACTS

On May 7, 1974, plaintiff and WMATA entered into contract number 1K0021, for the construction of Section K–2, Clarendon Station of the Metrorail System's Vienna Route for a fixed price of $29,664,702. The project involved approximately 3,000 feet of subway cut-and-cover construction, as well as construction of the Clarendon Station. The project included eight major construction activities: relocation of utilities, underpinning, installation of soldier piles, excavation, support of excavation (performed concurrently with excavation), form, rebar, and pour ("FRP") concrete, backfill and restoration.

Four buildings adjacent to the construction site (the Sears, Underwood, Kimels and Medical buildings) required underpinning of their foundations in order to safely perform the necessary excavation.[1] The lump sum price for underpinning by terms of the contract was $700,000. WMATA was obligated by the terms of the contract to obtain the rights (referred to by the parties as easements) from the owners of the four buildings necessary for Teer to begin underpinning.

On May 21, 1974, Teer submitted a Preliminary Progress Schedule to WMATA, which shows underpinning as one of the seven necessary activities to begin upon receipt of WMATA's notice to proceed. On June 17, 1974, WMATA approved Teer's proposal of Spencer White & Prentice as the subcontractor for underpinning on the four buildings. On June 17, 1974, WMATA issued a notice to proceed.

Teer submitted a Critical Path Method Schedule ("CPM"), depicting its plan for performing the work, which WMATA approved on October 17, 1974. The schedule provided for completion of all work by September 20, 1976, (a total of 826 calendar days after its inception) with interim dates specified for certain aspects of the work. Teer planned to complete all of the underpinning by December 6, 1974.

According to Teer's original plan, all of its major construction activities were to proceed in a continuous west to east fashion, with no more than one operation going on at a time. As planned, Teer could procure "backfill" materials directly from concurrently performed excavation. Teer contends that the delay in obtaining easements necessitated a change in the sequence of its work, for which it is entitled to acceleration costs. It is clear from the record developed below, however, that other factors contributed to the difficulties that Teer faced in performing the contract.

The record reflects that "[f]or various reasons, including problems with labor union pickets and the withdrawal from the work of the originally-intended subcontractors for the underpinning work and the excavation support system, Teer got off to a very slow start." Opinion, Corps of Engineers Board of Contract Appeals (hereinafter "Board Opinion") at 4, ¶ 9. Starting around June 26, 1974, labor pickets attempted to prevent Teer's unionized subcontractors from working with Teer's own nonunion labor. The Board found, and the record supports its finding, that the early critical operations of utility relocation, underpinning, and support of excavation were significantly affected by the labor problem. Board Opinion at 7, ¶ 14. The record reflects that on August 12, 1974, Teer noted an eight week delay caused by labor disputes and the withdrawal of a subcontractor. Teer also noted a delay in getting the Underpinning Drawings from its subcontractor.

---

1. Underpinning includes the placement of temporary and permanent support necessary to transmit foundation levels safely to lower bearing levels during and after construction of the subway facilities.

The record also reflects the elimination of bulkhead at section interface as a change in the original plan unrelated to the easement delays. It appears that Teer had substantial problems in purchasing soldier piles due to a shortage of steel throughout the country in the summer of 1974. Teer, in conjunction with another contractor, arranged an agreement between the two companies to eliminate an interface bulkhead and provide a ramp for Teer's access, in order to mitigate the soldier pile problem. The elimination of the use of an interface bulkhead by Teer precipitated a Value Engineering Change Proposal ("VECP") to the extent that Teer no longer had to remove the bulkhead as required by the contract, for which Teer was to have been paid $25,000. In fact, WMATA accepted this VECP on April 21, 1975, and paid Teer $12,500, half of the savings.

On August 23, 1974, Teer submitted to WMATA the Underpinning Drawings. The utility relocation and underpinning of the buildings were scheduled under the CPM to begin upon receipt of the notice to proceed. Utility relocation was to proceed ahead of excavation and was to take 265 days. Underpinning was planned to take 120 days. Teer was finally able to man the project in a normal manner on August 26, 1974. When it requested that WMATA grant it a 67 day extension on September 3, 1974, Teer referred to the labor disruption as requiring the redesign of the support of excavation scheme. In that letter Teer said:

> Union action has caused several of our subcontractors to refuse to proceed with their work. *This refusal has required us to redesign our support excavation scheme.* Also we have been required to retain a consultant for our underpinning operations. In essence, all relocation of utilities was stopped due to union pickets on the project.

Board Opinion at 9–10, ¶ 14 (emphasis added). Ten days later, on September 13, 1974, having heard rumors that WMATA had not yet obtained the underpinning easements, Teer's project manager informed WMATA that although the contractor was prepared to proceed with the un-

derpinning, it could not "due to lack of right-of-way." *Id.* at 6, ¶ 9.

Not until September 19, 1974 did Teer submit for approval its CPM depicting the proposed west to east continuous construction plan. At the same time, however, Teer proposed a dual shift, five day work week plan for the underpinning to be completed within 120 days. In actuality, the dual shift for underpinning did not commence until March of 1975, although there was a dual shift at work on drilling and other operations as of October of 1974. On October 17, WMATA approved the CPM submitted by Teer. In a letter on that same date, Teer again refers to the labor problems as the cause of their delays, stating:

> The CPM has not yet been approved, but it is evident that any delay to the underpinning and start of excavation support will delay the start of construction in the station area and this is a highly critical area.... To reduce the effect of this delay, we have started a second shift on the drilling operations and will have a second shift during excavation of the station. We are claiming a delay from June 17, 1974, because the union intimidation caused ECI–SOLETANCHE and Spencer, White and Prentice to back out on their agreement. Approximately two months' design time was lost because of this. More time was lost mobilizing our equipment and men to perform these operations.

Board Opinion at 11, ¶ 14.

On October 31, 1974, WMATA issued a stop work order directed at the underpinning of the Kimels and Medical buildings. The order was lifted as to the Medical building on November 15, 1974 and Teer began to underpin it on December 4, 1974. With respect to the Kimels building, the stop work order was lifted on December 6, 1974, and Teer began to underpin it on December 9, 1974.

On January 20, 1975, Teer submitted a request for a 40 day extension for labor problems and a 107 day extension that it attributed to the easement delays. WMATA responded to this request for an exten-

sion of time on February 5, 1975, by requesting more information regarding the delays. Specifically, WMATA asked Teer to elucidate the actions taken to minimize the delays cited in the January 20, 1975 request, the effect of the delays on the CPM and the future actions to reduce the effect of the delays. One week later, on February 12, 1974, Teer provided the requested additional information concerning the labor delays, but not concerning the easement delays. At that time, Teer stated: *"We have attempted to work parallel operations and different locations to minimize the delay due to this strike and we feel that the 40–day extension is fully justified."* Board Opinion at 15, ¶ 20 (emphasis added). Within two weeks, on February 27, 1975, WMATA granted Teer the requested 40 day extension for the labor delays. WMATA did not rule on the request for an extension of time for the easement delays because the further documentation it had requested had not been provided by Teer.

The next day, on February 28, 1975, WMATA requested that Teer amend its CPM in order that it reflect the course of the actual construction activities. The transit authority threatened withholding the next progress payment if the CPM were not revised by the time the next progress payment was due.

On March 6, 1975, Teer wrote that it could not fully evaluate the delay claim for the easement delay on the Kimels building. It stated that "[w]hen the station construction is actually delayed due to the late completion of the underpinning of the Kimels Furniture Store, we will be able to complete this claim." Board Opinion at 16, ¶ 24. In an additional letter that day, Teer reserves its claim for a 107 day extension to be attributed to the easement delays "until the construction is actually delayed. The actual and direct costs will be computed at that time and submitted to you." Board Opinion at 17, ¶ 25.

Not until March 21, 1975, did Teer begin its double shift on the underpinning work itself. Not until April 28, 1975, did Teer submit for approval its revised CPM.

Teer's letter accompanying the revised CPM asserts that because of the easement delays and in order to maintain progress and cash flow, the contractor changed the sequence of its operations to work both ends of the project. The contractor asserted that the added costs of rescheduling should be borne by WMATA because the delay was due to the lack of right-of-way. The April 28, 1975 letter concludes: "When these added costs are known, we will forward them to you. *We feel that by rescheduling the operations the added costs to the Authority will be reduced and an equitable adjustment to the contract can be made."* Board Opinion at 17, ¶ 26 (emphasis added). In response to this letter, WMATA replied: "We appreciate your efforts to reschedule the project to enable you to complete the contract work on time. However, no claim for additional costs can be entertained until these costs are justified to our satisfaction." *Id.* at 18, ¶ 27.

The record reflects that Teer completed the underpinning on or before June 19, 1975. In the spring of 1975, Teer attributed 14 days of delay to the easement problems in April, 32 days in May and 43 days in June. On June 30, 1975, WMATA informed Teer that its CPM and update were unacceptable because the actual sequence of activities was not reflected and because there had not been sufficient justification for the increase in the number of days of delay attributed to the easement delays. At the same time, WMATA requested that Teer expedite its proposal concerning the effects of WMATA's delay in obtaining the easements, a request the transit authority repeated on August 1, 1975.

On August 4, 1975, Teer claimed that as of July 22, 1975, it was 63 days delayed due to the easement delays. The next day, at a Progress Review Meeting, WMATA informed Teer that 63 days was unrealistic and inaccurate. The transit authority again stressed the need for the CPM to reflect the actual sequence of activities. In early September of 1975, Teer claimed to be 54 days behind due to the easement delays and stated that it could not give a definite date by which the CPM would be

revised. The next month, Teer again promised to revise its CPM and claimed to be 48 days behind due to the easement delays. On October 23, 1975, WMATA disputed the 48 day claim, saying, "Please note that you showed a delay of 14 work days in the April update. We are not aware of anything that increased the delay from 14 to 48 work days." Board Opinion at 22, ¶ 38.

Subsequently, Teer claimed to be behind schedule by 22 days in November of 1975, by 25 days in December of 1975, by 27 days in January of 1976, and by 48 days in February of 1976. On February 24, 1976, WMATA asked Teer for justification of its claim of a 42 work day delay in February, in light of Teer's January claim of 27 days. The Court notes that the record reflects that Teer never mentioned or indicated that it believed it had been required to accelerate its work over the course of more than a year after WMATA first requested the CPM revision to reflect the actual sequence of events, and during which time Teer was asked several times to supplement its request for an extension of time based on the easement delays.

But on March 17, 1976, Teer stated that the increase in 15 days in the contractor's claim of being behind schedule was due to its "inability to obtain approval to start entranceway excavation.... In order to meet our required target dates, we have of necessity revised our construction sequence to accelerate work. This acceleration was due, as you know, to the delay in obtaining all required easements." Board Opinion at 24, ¶ 44. WMATA immediately took issue with what represents Teer's first mention of an acceleration claim, writing:

> In our opinion, the increase in delay could not have been caused by delay in obtaining underpinning easements as the March 1975 Update had already taken into account the underpinning delays. You again revised your CPM in December 1975 and January 1976 for your convenience, to reduce the delay. By resequencing your operations, you showed a delay of 22 work days in December 1975 and the delay increased to 42 work days in February of 1976. Your letter does not explain the increase in delay as re-

quired by article 2.8(4) of the Contract Specifications.

Board Opinion at 24–25, ¶ 45. The letter requests that any resequencing should be reflected in a revised CPM and concludes: "Please note that any accaleration [sic] of work planned by you is for your own convenience." *Id.*

In May of 1976, one year and three months after the claim for an extension of time based on the easement delays was filed, WMATA again invited Teer to submit a final proposal of a time extension for the easement delays. WMATA suggested that incorporation of the time extension prior to the interim completion date of July 5, 1976, would "eliminate the need to assess liquidated damages under article 2.2." Board Opinion at 25, ¶ 47. In early June of that year, Teer wrote that its legal counsel was reviewing the easement delay claim. Later that month, Teer indicated that it would submit soon its request for an equitable adjustment, claiming that 194 calendar days could be attributed to the easement problem, apparently because the underpinning was actually completed 194 days after the initial CPM date.

On July 22, 1976, WMATA asserted that Teer's late start-up was due to the picketing, withdrawal of subcontractors and Teer's decision to revise its construction methods. WMATA stated: "In your letter of 9/19/74, you proposed to perform all construction work on a two shift, five day week. You also proposed to complete the underpinning work in 120 work days. *However, you did not start the second shift for underpinning until the third week of March, 1975.*" Board Opinion at 29, ¶ 50 (emphasis added).

Not until December 1, 1976, did Teer finalize its claim for an equitable adjustment based on the effects of the easement delays and allegations of acceleration. On January 6, 1977, WMATA responded that there was no evidence of acceleration because the work was not completed within 700 days after the notice to proceed, as required by the contract. WMATA noted that Teer had yet to respond to the con-

cerns raised by its July 22, 1976 letter. The transit authority also asserted that the acceleration claim was "based on assumptions not born [sic] by facts. Under these conditions, we cannot accept your claim." Board Opinion at 31–32, ¶ 55.

Teer persisted in its acceleration claim, stating on February 1, 1977, that the easement delays caused it to accelerate, "however, the change is still having a ripple effect on our completion and the change should be grounds for time sufficient to eliminate any and all proposed liquidated damages." *Id.* at 36, ¶ 59. In an attempt to explain the length of time Teer took to finalize its claim concerning the easement delays, Teer stated, "To date, we have not furnished you with all the data concerning extensions of time because *there appeared to be no cause for alarm or the need to assess liquidated damages." Id.* at 36, ¶ 59 (emphasis added). On February 3, 1977, Teer expressed its disturbance that the progress payment for January had been withheld, but acknowledged that it had been delayed for other reasons than the easement delays.

In late May of 1977, liquidated damages of approximately $1,800,000 were assessed against Teer. In August of 1977, all work was accepted as complete and WMATA indicated that it would take a position on the claim for easement delays in the near future. Since that time, however, the liquidated damages have been repaid to Teer, and the claims for extensions of time have been settled.

DISCUSSION

Before the Court are cross-motions for summary judgment. The scope of the Court's review is limited to the record.[2] Unlike the standard in ordinary motions for summary judgment, the standard of review in this case is derived from the Wunderlich Act, 41 U.S.C. § 321 *et seq.* The decision presented for review is "final and conclusive unless it is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not sup-

ported by substantial evidence" or is erroneous as a matter of law. 41 U.S.C. § 321; *see Expressway Construction, Inc. v. WMATA,* 676 F.Supp. 16, 17 (D.D.C.1987) (Hogan, J.); *General Railway Signal Co. v. WMATA,* 598 F.Supp. 595, 596 (D.D.C. 1984) (Gesell, J.).

Plaintiff's arguments are three-fold. First, plaintiff maintains that Teer's work was constructively accelerated by WMATA's failure to timely grant the construction company's request for a time extension for delays caused by the transit authority's delay in obtaining underpinning easements. By finding otherwise, Teer contends that the Board erred as a matter of law. Second, Teer maintains that the Board's award is manifestly inadequate because it used the wrong method of determining the appropriate adjustment and it excluded certain costs that plaintiff alleges were caused by the easement delays. Third, plaintiff asserts that WMATA's decision to withhold the additional profit awarded by the Board was arbitrary and capricious.

A. *Acceleration*

■ On October 31, 1974 WMATA issued a stop order, which directed Teer to refrain from installing soldier piles for support of excavation in front of the Kimels and Medical buildings. Because of that stop order, Teer contended below that it was forced to relocate its soldier pile operation to the East Line, where no stop order was in effect. But even before WMATA's failure to obtain a right-of-way was established, Teer had proposed working parallel operations in order to compensate for the labor delays. The stop order was removed as to the Medical Building on November 15, 1974 (15 days after it took effect) and on December 6, 1974 (36 days after the stop order) as to the Kimels building. Not until *January 20, 1975,* however, did Teer request a time extension of 107 days based on the easement delays. In response, WMATA requested additional information

---

**2.** The record below is voluminous, consisting of 1,716 pages of transcript, an appeal file consisting of 552 Tabs (some of many pages), 85 hearing exhibits (some of several pages and some of many pages), and 447 pages of briefs.

concerning actions taken by Teer to minimize the delay, the effect on the CPM schedule, and any future actions contemplated to reduce the effect of the delay. WMATA indicated that it would not consider the request for an extension of time until it received the requested additional information. Teer did not provide that documentation until December 1, *1976*, almost two years after WMATA requested it.[3]

Teer asserts that it completed the contract on time despite WMATA's "refusal" to grant Teer an extension of time for the underpinning access delays. Teer further asserts that WMATA insisted that Teer meet the original schedule, threatened to withhold progress payments, and alluded to liquidated damages. Teer contends that these acts by WMATA constitute constructive acceleration. On that basis, Teer assigns error to the Board for finding that no constructive acceleration occurred.

The Board of Contract Appeals found that a compensable time extension to Teer for the easement delays was appropriate, but concluded that no acceleration occurred. The Board did not believe that the delayed easements would have resulted in massive delays *but for* an acceleration. Board Opinion at 59. Nor did the Board believe that the "easement delays caused the work to be constructively accelerated or actually resulted in the bulk of the experienced delays to completion dates." *Id.* The Board did not doubt that the access delays contributed to disruption of the operations but found there had been prior disruption due to the labor problems and relocation of utilities. *Id.* at 60.

The Board cited WMATA's lack of interference with Teer's control of its own work schedule as supporting its conclusion, and noted Teer's "relaxed attitude towards submitting its requests for time extensions," evinced by Teer's failure to provide additional information requested by WMATA concerning the time extension sought. *Id.* at 59. Teer contends that these references

are erroneous and irrelevant to the issue of constructive acceleration.

In order to recover acceleration costs, a contractor must establish three things: 1) that any delays giving rise to an acceleration order were excusable; 2) that the contractor was ordered to accelerate; and 3) that the contractor actually accelerated, incurring additional costs. *Norair Engineering Corp. v. United States*, 229 Ct.Cl. 160, 666 F.2d 546, 548 (1981); *see also* 2 R. Nash & J. Cibinic, *Federal Procurement Law* 1240 (3d ed. 1980) (stating that in almost all cases of compensable acceleration, the government has required the contractor to meet the current contract delivery schedule in the face of excusable delays). Teer contends that all of the elements of constructive acceleration are present in this case.

As to the first element, the Board found that WMATA's delay in obtaining the easements constituted a compensable delay of "probably less than 30 days." WMATA counters that at no time during the period within which Teer alleges that constructive acceleration occurred had Teer determined definitively that the job would be delayed beyond its completion date due to easement problems. It is true that even while the underpinning delays were pending, in contemporaneous correspondence, Teer referred almost exclusively to its labor problems rather than to the easement delays. And after it received access to the Kimels building, Teer revised its underpinning plan for that building, obviating the need for the easement in the first place. Moreover, Teer itself delayed the consideration of the request for extension of time by failing to provide the requested additional information for almost two years, stating that it could not fully evaluate its delay claim until the construction of the station was actually delayed.[4] It must be noted that during the time that the underpinning was being performed, Teer reported in its monthly schedule updates that it was any-

---

**3.** In stark contrast, WMATA asked for and Teer promptly provided additional information concerning the labor delays. Shortly after the additional information was received, WMATA grant-

ed to Teer its entire claim for 40 days attributed to the labor problems.

**4.** *See* note 3, *supra.*

where from 14 to 63 days behind. When Teer submitted its request for an extension of time on January 20, 1975, it asked for 107 days to compensate for the easement delays.

As to the second element of constructive acceleration, Teer contends that WMATA's acts and statements rise to the level of an acceleration order. On February 28, 1975; WMATA asked Teer to revise its CPM schedule to reflect Teer's actual sequence of work. The request indicated that the next progress payment was contingent upon the submission of the revised CPM. Teer states: "Even though WMATA's actions compelled Teer to resequence its work, this directive precluded the possibility of properly adjusting the *original* schedule by incorporating a time extension and thus forced Teer to commit to a more costly performance plan in order to attempt to meet the interim and final completion dates *unadjusted* for the easement delays." Plaintiff's Memorandum of Points and Authorities at 29 (emphasis in original). Teer contends that WMATA's failure to act on its requested time extensions in a timely manner should be treated as an implied order to accelerate. *See Freeman Electric Construction Co.*, DOT CAB Nos. 74–23A & 23B, 77–1 BCA ¶ 12,258 (1976) (suggesting that failure to furnish information peculiarly within the claimant's knowledge precludes the establishment of a prima facie case of entitlement to a time extension). The contractor asserts that WMATA's allusion to the assessment of liquidated damages makes the constructive order to accelerate more direct.

It is customary and proper for a contracting officer to request additional information to substantiate a request for an extension of time. WMATA never indicated that the request for an extension would be denied. But the transit authority required substantiation of the extension request, which could only be established after Teer finalized its claim and revised its schedule to reflect the actual manner of its performance. The record reflects that it is also customary for the contractor to be required to revise its CPM schedule to reflect the actual sequence of its work.[5] Indeed, the request that the schedule be revised to reflect actual performance was a routine request that cannot be construed as an order to accelerate.

With respect to the third element, that actual acceleration occurred, Teer states that it abandoned its CPM schedule several months into this $30 million project directly because of the easement delays, to avoid shutting down its major operations. The contractor contends that it completed the project on an accelerated basis because WMATA insisted upon concurrent and parallel operations to minimize delays. Further, Teer reiterates that the threats of withholding progress payments and the specter of liquidated damages added to the accelerated basis on which Teer approached the job.

WMATA responds that not only is Teer rehashing the arguments it made before the Board, it has failed to demonstrate that the Board's decision is erroneous as a matter of law or was not supported by substantial evidence. The Court concurs with WMATA's assessment. Teer appears to claim that the approximately 85 day delay on WMATA's part in obtaining the easements for the Medical and Kimels buildings provides the basis for recovery of *all* of its cost overruns on all of its major·construction activities. It claims that the rese-

5. Transcript at 662 (testimony of George Theodore Brayman, the project manager of Teer's construction operation on the project at the Clarendon Station and a witness for Teer at the hearing before the Board). He testified that it is customary for an owner to require an accurate presentation of the way that the construction is progressing. *Id.* at 695. As to the monthly updates, he testified:

A monthly update would show what you're doing, where you plan to go and the dates you expect to start operations. It would normally show your progress as days or as negative float that comes out of the end of the program. *It would show a revision or resequencing, changing work schedules, going at it in a different manner in which you had originally planned.*

*Id.* (emphasis added). Mr. Brayman further stated: "I think an owner would require an accurate presentation of the way that you're working on a project." *Id.*

quencing of its work resulted from its "acceleration" to overcome the access delay.

The Court affirms the determination of the Board on the issue of acceleration. Not only is that ruling supported by the evidence, it reflects a sound application of the law concerning acceleration. Although the evidence supports a finding in favor of Teer on the first element of acceleration, as some compensable delay exists, Teer's acceleration claim must fail on the remaining two elements.

The record does not support a finding that WMATA ordered Teer to accelerate. Its request for additional information on the extension claimed for the easement delays cannot be construed as an order to accelerate. Further, by asking for an updated CPM that would reflect the actual sequence of Teer's work, WMATA did what any sound owner would do in order to oversee the progress of the work. And by alluding to the withholding of progress payments in its request for an updated CPM, WMATA effectively notified the contractor that it would be unable to evaluate Teer's progress, and hence, whether Teer deserved the next progress payment, without some reference as to the actual work that had been completed. Further, the Court notes that none of the evidence contemporaneous to the time that the alleged acceleration order issued supports Teer's argument that it was accelerated. To the contrary, on March 6, 1975, shortly after WMATA asked Teer to revise its CPM, Teer referred to the delayed access to only one of the two buildings at issue, and makes no claim that it construed that request in conjunction with the undetermined claim for an extension of time for the easement delays as an acceleration order. It is difficult to fathom that a contractor of Teer's stature would make no mention for over one year that it had been accelerated. Indeed, not until March of 1976 did Teer first claim that as a result of the easement delays it had revised its construction sequence in order to accelerate work. And

the record fully supports the Board's finding that factors other than the easement delays contributed to the resequencing of the construction operations.[6] WMATA did not direct any resequencing of work by Teer; the transit authority only sought to oversee the actual work in progress.

Teer's claim of acceleration also fails as to the third element. The record does not support a finding that Teer actually accelerated its work, although it is conceded by WMATA that Teer incurred some additional costs due to the easement delays for which it was entitled to an equitable adjustment.

### B. Method of Determining the Equitable Adjustment

■ Although the Court affirms the Board's determination that Teer was not constructively accelerated, it must review the Board's determination on the issue of quantum. The Board stated, "The fact that we do not believe there were elements of constructive acceleration involved in the resequenced work is not dispositive of Teer's quantum claim." Board Opinion at 60. The damages award of the Board is an administrative finding of fact which can only be disturbed if found to be invalid under contractually established review standards for disputes under this contract. See General Railway Signal, supra, 598 F.Supp. at 596; see also United States v. Callahan Walker Construction Co., 317 U.S. 56, 61, 63 S.Ct. 113, 115, 87 L.Ed. 49 (1942) (stating that the ascertainment of an equitable adjustment is an inquiry of fact which can only be disturbed if erroneous).

Teer presented its quantum evidence to the Board on a modified total cost basis. The Board was not persuaded, however, by Teer's quantum evidence, finding it "grossly exaggerated" and noting that "there were delays and disruptions due to other causes before, during, and after the underpinning delays." Board Opinion at 61.

---

**6.** Mr. Brayman testified that the need for cash flow contributed directly to the resequencing of operations. Transcript at 684. He also testified as to the impact of the withdrawal from the project of a soldier pile subcontractor, the shortage of steel that resulted, and the combined bulkhead that resulted in greater efficiency. See id. at 687–88.

Teer seeks a remand for reconsideration of quantum. Teer contends that the Board should have used a jury verdict basis for awarding damages. WMATA counters that the Board did, in a sense grant a jury verdict, citing the Board's statement that within "a range of possible price adjustments, any one of which could be considered equitable, ... the Contracting Officer's unilateral adjustment here is at the lower end of the possible range." Board Opinion at 61.

The Board's adjustment assumed that the delayed easements affected only four major construction activities: underpinning, excavation, support of excavation and traffic maintenance in the station area. Board Opinion at 61–64. Teer asserts that soldier pile installation, concrete placement and backfill operations were improperly excluded from the Board's calculations. Even if no acceleration occurred, Teer submits that the Board's adjustment was inadequate because it did not take into account the resequencing of operations and the consequential inefficiencies of the change of sequence. Further, Teer argues that the untimely easements delayed station construction, which in turn caused tangible increased costs.

Teer also asserts that the Board erroneously concluded that the contractor made no attempt to reduce its claimed labor hours to account for change in work or work involved in other claims. Teer submits that WMATA seeks to rely on "a collage of selected but trivial incidents" to attribute to Teer the delays and costs caused by the easement delays.

The Board stated that Teer's quantum evidence assumed a relationship to the easement delay claim "greatly beyond what we are persuaded exists in fact." Board Opinion at 61. It is apparent that the only quantum evidence offered by WMATA was presented conditionally, to be used only if the Board found that the easement delay fully impacted every construction activity. *Id.* The Board stated: "We have not been helped to determine a more appropriate adjustment by Teer's seeming all or nothing approach." *Id.* Additional-

ly, the Board found the testimony of Teer's expert to be lacking credibility.

Finding that the quantum evidence presented was inappropriate for the determination of the equitable adjustment, the Board employed that portion of the Bechtel estimate that WMATA's Contracting Officer had not used when he formulated the unilateral adjustment. The Board stated: "We have no basis to determine that the allowances for maintenance of traffic, excavation or support of excavation should be larger or smaller than those estimated by Bechtel and adopted by the Contracting Officer." *Id.* at 62. The Board then calculated an equitable adjustment for some increase in costs of the underpinning itself.

The Court agrees with the Board that the determination of an equitable adjustment is rarely a precise mathematical formula. The record supports the finding that the easement delays surely did not account for a substantial portion of the additional costs claimed by the contractor. The Board's calculation has a sound legal basis. In fashioning the equitable adjustment, the Board adopted the Bechtel estimate, relying on *Groves–Black (A Joint Venture)*, ENG BCA No. 4557, 85–3 BCA ¶ 18,398, at p. 92,286. In *Groves–Black*, the Board adjusted a portion of an estimate to determine the costs of inefficiencies, acknowledging that estimating is more of an art than a science. *Id.* As in this case, the Board had not accepted the contractor's figures in *Groves–Black* because they were unpersuasive. Indeed, the record supports the finding of the Board in this case that the contractor's figures were unpersuasive. For these reasons, the Court affirms the determination of the Board in fashioning an equitable adjustment. The method of determining the equitable adjustment is sound. There exists no basis for the Court to remand the matter to the Board for redetermination. Teer's failure to provide quantum evidence on other than an all-or-nothing basis was a tactical decision with which it will have to abide. This Court cannot substitute its judgment for the judgment of the Board.

## C. Withholding of Additional Profit

[3] WMATA has withheld that portion of the Board's award that consists of additional profit ($58,870). Teer asserts that in so doing WMATA has been arbitrary and capricious. It is apparent from the Board's decision that the additional profit was awarded Teer due to the "unusually long period of time" for the disposition of the appeal below.[7] On reconsideration of that portion of the award, the Board stated that it did not purport to allow prejudgment interest. Instead, the Board asserted that it had attempted to make an equitable adjustment for additional profit, for which there has been a waiver of sovereign immunity according to *General Railway Signal Co. v. WMATA*, 625 F.Supp. 22 (D.D.C. 1985) (Gesell, J.), *affirmed*, No. 85–5753, slip op. (D.C.Cir. August 21, 1987).

WMATA contends that neither its Compact nor the changes clause in the contract at hand constitutes a waiver of its immunity from prejudgment interest. Further, it asserts that prejudgment interest cannot be disguised by the label "additional profit." *See Library of Congress v. Shaw*, 478 U.S. 310, 106 S.Ct. 2597, 92 L.Ed.2d 250 (1986).

The United States Court of Appeals for the District of Columbia Circuit affirmed the decision of the District Court in *General Railway Signal, supra*, which held that the equitable adjustment language in the changes clause of the contract at issue in that case constituted a waiver of WMATA's sovereign immunity as to prejudgment interest. WMATA's petition for rehearing and suggestion for rehearing *en banc* in the *General Railway Signal* case is currently pending before the Court of Appeals.[8]

The Court will hold the decision on the issue of the additional profit in abeyance until the Court of Appeals has ruled on the petition for rehearing in the *General Railway Signal* case, *supra*. As it appears that the final decision of the Court of Appeals in that case will bear directly on the issue presented in this case, the Court will defer its ruling on the additional profit award that WMATA has withheld pending the ruling of the Court of Appeals.

## CONCLUSION

In summary, the Court denies Teer's motion for summary judgment except on the issue of prejudgment interest. Teer has failed to establish that the Board erred in its determination that there was no constructive acceleration. Further, there is no basis for a remand on the equitable adjustment, as the Board adopted a sound approach in its fashioning of an additional award. The Court grants WMATA's motion for summary judgment. An appropriate order will accompany this memorandum.

## ORDER

Upon consideration of the parties' cross-motions for summary judgment, the oppositions thereto, and the entire record in this case, it is by the Court, this 15th day of July, 1988,

ORDERED that the plaintiff's motion for summary judgment be, and hereby is, denied, except on the issue of additional profit, which the Court will hold in abeyance; and it is further

ORDERED that the defendant's motion for summary judgment be, and hereby is, granted, except on the issue of additional profit, which the Court will hold in abeyance; and it is further

ORDERED that the Court will defer ruling on the issue of additional profit until after the United States Court of Appeals for the District of Columbia Circuit rules on the pending petition for rehearing and

---

7. Indeed, the decision below was not rendered for five years after the hearing below concluded.

8. In another case, the D.C. Circuit has held that WMATA's sovereign immunity from liability for prejudgment interest barred a contractor's recovery for interest foregone on equity capital used to finance the direct costs of delays caused by WMATA. *George Hyman Construction Co. v. WMATA*, 816 F.2d 753, 760 (D.C.Cir.1987). That case involved the question of whether the suspension of work clause constituted a waiver of WMATA's sovereign immunity.

suggestion of rehearing *en banc* in *General Railway Signal v. WMATA*, No. 85–5753. The parties shall bring to the attention of this Court the decision of the Court of Appeals in the *General Railway Signal* case as soon as it becomes available.